

**FILED**

May 30 2025, 9:51 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court



IN THE

# Court of Appeals of Indiana

H.R.,

*Appellant*

v.

M.R.,

*Appellee*

---

May 30, 2025

Court of Appeals Case No.
25A-PO-17

Appeal from the Scott Circuit Court

The Honorable Alison T. Frazier, Magistrate

Trial Court Cause No.
72C01-2407-PO-122

---

**Opinion by Judge Brown**
Chief Judge Altice and Judge Tavitas concur.

**Brown, Judge.**

[1] H.R. appeals from the trial court's order of protection and claims the court clearly erred because the evidence is insufficient to support the order. We agree and reverse.

## Facts and Procedural History

[2] H.R. is the father of M.R. On July 12, 2024, then twenty-four-year-old M.R. filed a petition for protective order against H.R. alleging that she had "been a victim of stalking." Appellant's Appendix Volume II at 11.[1] Specifically, she alleged that H.R. "put cameras up" in the home she shared with him because he wanted "to control" her; he "filed for guardianship" because he was "trying to control" her; and he "took [her] phone. He pays the bill, but he [was] logging into [her] accounts and sharing [her] personal information" because he was "trying to control" her. *Id.* at 13. M.R. alleged that based upon these acts, she is "scared" of H.R. *Id.*

[3] On August 19, 2024, H.R. filed a Motion for the Court to Take Judicial Notice of the guardianship proceedings under cause number 72C01-2407-GU-42. That same day, he also filed a Motion to Dismiss the petition for a protective order arguing that none of the incidents alleged by M.R. constituted stalking or any "form of physical threat." *Id.* at 23. He asserted that H.R. had not shown that

---

[1] M.R. also filed a petition for protective order against H.R.'s girlfriend, H.W. The trial court's ruling on that petition is not part of the record or this appeal.

his act of "installing a security system *on his property*"[2] or any actions regarding the phone "[he] owns" is impermissible. *Id*. He further argued that he sought guardianship, which was his legal right to seek, "due to his concern for [M.R.'s] constant drug use," and he was "trying to take steps to avoid his daughter (the Petitioner) from dying of an alcohol and drug overdose." *Id*. at 23-24.

[4] On September 10, 2024, M.R. filed a Motion for Temporary Ex Parte Order of Protection. She asserted that there had been "a new development" warranting an ex parte order of protection. *Id*. at 28. She claimed that she received a letter from an attorney representing H.R. in a real estate matter who requested her presence "for the closing on a property sale owned partially by her and partially by [H.R.]" but that she "had no recollection of signing any purchase agreement" regarding that property. *Id*. at 28-29. She alleged that H.R. forged her signature as "she was in a lockdown rehabilitation facility at the date and time of the e-signing" of the purchase agreement and H.R. "had possession of her cell phone at the time." *Id*. at 29.

[5] On September 13, 2024, H.R. filed a renewed Motion to Dismiss M.R.'s petition for a protective order. M.R. filed amended Petitions for Protective Order and Temporary Ex Parte Order of Protection on September 16 and October 29, 2024. The amendment on October 29th indicated that, during a

---

[2] The record reveals that H.R. owned the home and allowed M.R. and her daughter to live with him rent-free from February through July 2024. H.R. filed an eviction action against M.R. on July 18, 2024. The eviction complaint was denied following a hearing on September 16, 2024.

parenting time exchange between M.R. and her daughter's father, H.R. "happened to be present at the meeting location" despite having "no reason to be at the exchange location at that date and time[.]" *Id*. at 49. M.R. alleged that this led her "to believe that [H.R.] was either following her or had been in contact with an outside party regarding her whereabouts." *Id*. H.R. filed another Motion to Dismiss M.R.'s pending petitions alleging, among other things, that the petitions were not properly verified. M.R. responded with an Amended Verified Petition for Protective Order that essentially mirrored her October 29th filing. *Id*. at 75.

[6] The court held an evidentiary hearing on November 8, 2024. At the outset, the court denied H.R.'s motion to dismiss. M.R. then testified about her allegations of stalking against H.R. She stated that in June 2024, while she was in "treatment" for alcohol addiction at Sunrise Recovery, H.R. told her that if she "left rehab" he would file a guardianship over her. Transcript Volume II at 54. She stated that she started to get worried about "the control that he was . . . having." *Id*. at 55. She testified that while she was still in treatment, she learned that "he had been accessing [her] Facebook" through her iPhone that was in his possession. *Id*. at 56. When she told him to stop, H.R. made financial threats that M.R. would be required to repay him for expenditures he had made on her behalf and he also informed her that he intended to sell jointly-owned property without her consent. She stated, "I felt like it was like threatening me not to pursue anything with the land, because . . . I would have to owe him money in the end." *Id*. at 58. M.R. testified that she believed that,

while she was in treatment, H.R. forged her name on the purchase agreement for the property she jointly owned with him. She stated that, after her discharge from treatment, H.R. told her she was not allowed back at his residence where he had been previously allowing her to live and, when she came to the residence to retrieve some of her belongings, he spoke to her via the Ring camera he had installed and told her that she "had ten seconds to leave the house." *Id.* at 69. She stated that she perceived this as a "threat." *Id.* She further testified that even after she regained possession of her iPhone, she believed H.R. was "logged in" to her social media accounts and accessing her personal messages. *Id.* at 73. M.R. admitted, "the phone belongs to my dad . . . the social media accounts were connected to that phone. That was the phone I used, but it was under his plan." *Id.* at 74.

[7] M.R. further testified to an incident in March 2024, when H.R. "had picked [her] up from reha[b] . . . and he did give me alcohol that day, at the end . . . it might have had like a reverse effect to the medicine that they had gave me at the rehab." *Id.* at 76. She had "possession of a firearm on that evening" and was "visibly distraught" when H.R. made "a video recording" of her. *Id.* She stated that after taking the video, he took her to his "house in Lexington," made her "some food" and then, when she tried "to run away," he "called the cops." *Id.* When asked if "when you were holding the firearm and he was taking a video of you, did you feel safe at that point in time," M.R. responded, "No." *Id.* at 77. M.R. testified regarding a "recent" incident during a parenting time exchange when she "was picking up [her] daughter from her father" in a CVS

parking lot and she observed H.R. enter the parking lot and exit the parking lot. *Id*. at 81. M.R. stated that all of H.R.'s behavior has caused her "more anxiety" and "financial" strain. *Id*. at 85. On cross-examination, she admitted that she did not believe that H.R.'s behavior "was done to harass [her]" but that she believed he was doing it for "[c]ontrol." *Id*. at 94. M.R. admitted that she had an alcohol problem and that her life had been somewhat "out of control" during the relevant time period. *Id*.

[8] Due to time constraints and the court wanting to wrap up the hearing, H.R. testified very briefly and, when asked if he had "ever physically harmed" M.R., he responded, "Never." *Id*. at 110. He explained that all he had ever tried to do was to help M.R., stating that he had simply hoped "she would get back on her feet and get her life straightened out." *Id*. at 112.

[9] On December 6, 2024, the trial court issued its findings of fact, conclusions thereon, and order granting M.R.'s request for a protective order. In relevant part, the court found that "as soon as [M.R.] attempted to make her own decisions regarding her health, [H.R.] began sending threats to [M.R.]. This included the threat to file a petition for guardianship over her person, to evict her, and to cost her a 'landslide' of fees and bills for which they had no agreement or contract for repayment." Appellant's Appendix Volume II at 99-100. The court further found that M.R. "previously struggled with an overconsumption of alcohol," that H.R. "was the main individual, if not the only individual, who took it upon himself to seek treatment for [M.R.]," and that H.R.'s attempts to help her were "at some point well-meaning." *Id*. at

100. The court found that H.R.'s "actions regarding [M.R.] beginning on or about June 6, 2024[,] and onward constitute harassment, stalking, and impermissible contact towards [M.R.]." *Id*. The court found "[M.R.]'s fear of [H.R.] to be reasonable and her testimony to be credible." *Id*.

[10] Based upon these findings, the court concluded that the evidence supported a finding that H.R. had "committed stalking and repeated acts of harassment" against M.R. entitling her "to an order of protection in accordance with the Indiana Civil Order Protection Act and I.C. 34-26-5-2." *Id*. Accordingly, the court granted an order of protection in favor of M.R. and against H.R. for a period of one year.

## Discussion

[11] H.R. argues that the trial court erred in granting M.R.'s petition for a protective order because she "failed to establish that [he] posed a credible threat of physical harm to her." Appellant's Brief at 11. H.R. further asserts that the trial court erred in finding that he stalked or harassed M.R. because she "did not prove that [he] engaged in a course of conduct involving repeated, impermissible contact that would cause a reasonable person to feel terrorized." *Id*. at 12.

[12] Before addressing H.R.'s arguments, we note that M.R. did not file an appellee's brief. When an appellee fails to submit a brief, we do not undertake the burden of developing arguments, and we apply a less stringent standard of review, that is, we may reverse if the appellant establishes prima facie error.

*Bixler v. Delano*, 185 N.E.3d 875, 877-878 (Ind. Ct. App. 2022) (*citing Zoller v. Zoller*, 858 N.E.2d 124, 126 (Ind. Ct. App. 2006)). Prima facie is defined as "at first sight, on first appearance, or on the face of it." *Id.* (quoting *Graziani v. D & R Const.*, 39 N.E.3d 688, 690 (Ind. Ct. App. 2015)). This rule was established so that we might be relieved of the burden of controverting the arguments advanced in favor of reversal where that burden properly rests with the appellee. *Id.* (citing *Wright v. Wright*, 782 N.E.2d 363, 366 (Ind. Ct. App. 2002)).

[13] As this case involves the issuance of a protective order, we begin by noting we are mindful that in 2023, the Indiana Supreme Court observed, "[t]hree years ago, we recognized that domestic and family violence is 'a public-health crisis that harms both the victim and those within the victim's household.' Since that decision, the crisis in Indiana has—unfortunately—only intensified." *S.D. v. G.D.*, 211 N.E.3d 494, 495 (Ind. 2023) (quoting *S.H. v. D.W.*, 139 N.E.3d 214, 216 (Ind. 2020)).

[14] "When reviewing a petition for a protective order, our trial courts are directed by Indiana's Civil Protection Order Act." *Id.* The Act, enacted in 2002, has the express purpose of promoting the: "(1) protection and safety of all victims of domestic or family violence in a fair, prompt, and effective manner; (2) protection and safety of all victims of harassment in a fair, prompt, and effective manner; and (3) prevention of future domestic violence, family violence, and harassment." Ind. Code § 34-26-5-1. The Act provides, in pertinent part:

(a) A person who is or has been a victim of domestic or family violence may file a petition for an order for protection against a:

(1) family or household member who commits an act of domestic or family violence; or

(2) person who has committed stalking under IC 35-45-10-5 or a sex offense under IC 35-42-4 against the petitioner.

(b) A person who is or has been subjected to harassment may file a petition for an order for protection against a person who has committed repeated acts of harassment against the petitioner.

Ind. Code § 34-26-5-2. As relevant here, "[d]omestic and family violence" includes stalking, as that term is defined by Ind. Code § 35-45-10-1. Ind. Code § 34-6-2-34.5.

[15] "Stalk" is defined as "a knowing or an intentional course of conduct involving repeated or continuing harassment of another person that would cause a reasonable person to feel terrorized, frightened, intimidated, or threatened and that actually causes the victim to feel terrorized, frightened, intimidated, or threatened." Ind. Code § 35-45-10-1. "Harassment" means "conduct directed toward a victim that includes but is not limited to repeated or continuing impermissible contact that would cause a reasonable person to suffer emotional distress and that actually causes the victim to suffer emotional distress." Ind. Code § 35-45-10-2. "[I]mpermissible contact" includes (1) following or pursuing the victim; (2) communicating with the victim; and (3) posting on social media if the post is directed to the victim or refers directly or indirectly to

the victim. Ind. Code § 35-45-10-3(a). Further, this list is nonexclusive. Ind. Code § 35-45-10-3(b).

[16] Subsection 9(h) of the Act provides, in relevant part:

> A finding that domestic or family violence or harassment has occurred sufficient to justify the issuance of an order under this section means that a respondent *represents a credible threat to the safety of a petitioner or a member of a petitioner's household*. Upon a showing of domestic or family violence or harassment by a preponderance of the evidence, the court shall grant relief necessary to bring about a cessation of the violence or the threat of violence. . . .

Ind. Code § 34-26-5-9(h) (emphasis added). "The threat posed by the respondent is viewed objectively, and the threat must be credible, meaning plausible or believable." *L.R. b/n/f H.R. v. M.H. b/n/f N.H.*, 223 N.E.3d 675, 681 (Ind. Ct. App. 2023) (citation omitted). "Thus, the petitioner must prove, by a preponderance of the evidence, that there are reasonable grounds to believe that the respondent presently intends to harm the petitioner or the petitioner's family." *Id*. If the petitioner meets their burden, the trial court "must issue a protective order and 'grant relief necessary to' end the violence or threat of violence." *Id*. Because "these court-ordered measures may impose significant restrictions on a respondent's freedom of movement and other rights," a court "faced with a request for protective order must balance, on the one hand, the need to protect actual and threatened victims against, on the other, the onerous burden borne by those erroneously subject to such an order." *S.H.*, 139 N.E.3d at 219.

[17] Protective orders are similar to injunctions and therefore in granting an order the trial court must make special findings of fact and conclusions thereon. *R.H. v. S.W.*, 142 N.E.3d 1010, 1014 (Ind. Ct. App. 2020). We apply a two-tiered standard of review: we first determine whether the evidence supports the findings, and then we determine whether the findings support the order. *Id.* In making these determinations, we neither reweigh the evidence nor determine the credibility of witnesses, and we consider only the evidence favorable to the trial court's decision. *T.M. v. T.M.*, 188 N.E.3d 42, 44 (Ind. Ct. App. 2022), *trans. denied*.

[18] Here, our thorough review of the record reveals that the evidence does not support the trial court's findings and the findings do not support the court's issuance of the order of protection. Although M.R. provided ample testimony as to her subjective feelings of fear and anxiety regarding her father's behavior, her testimony did not include any statement or even an implication that she is, or ever has been, in fear of actual physical harm. As noted by H.R., the trial court focused heavily on M.R.'s claims that H.R.'s actions made her feel scared and anxious, finding her testimony credible on this issue, but the court failed to link this testimony to any objective evidence, as there was none, to support a finding that H.R. represents a current threat to M.R.'s safety.

[19] Moreover, we must agree with H.R. that the court's finding that he committed harassment and stalking is unsupported by the evidence. Harassment becomes "stalking" only if it is a repeated and continuing course of conduct that causes the victim to feel, and would cause a reasonable person to feel, "terrorized,

frightened, intimidated, or threatened." Ind. Code § 35-45-10-1. There was substantial evidence that M.R. accepted and even welcomed H.R.'s financial and emotional support for a considerable time period of obvious struggle in her life. Her testimony was somewhat equivocal regarding exactly when, and to what extent, she attempted to fully separate her affairs from his, and we are simply not seeing anything resembling a repeated and continuing course of conduct by H.R. that caused M.R. to feel terrorized, much less that would cause a reasonable person to feel terrorized. Indeed, M.R. admitted that she had never claimed that her father harassed her, but simply that he was trying to intervene too much in her life and control her. Specifically, when asked on cross-examination whether she believed H.R.'s behavior "was done to harass [her]," she stated, "I didn't say that it was done to harass me." Transcript Volume II at 94. When asked, "What do you think it was done for," she responded, "Control." *Id*. Significantly, and as already noted, M.R. never stated that she feared H.R. would physically harm her or that she was presently and reasonably in fear for her physical safety as of the date of the evidentiary hearing.[3]

[20] While we observe that the Indiana Supreme Court has instructed that "[i]n close cases . . . when the evidence could lead a court to grant or deny a petition . . . the trial court is the one to make that call[,]" *S.D.*, 211 N.E.3d at 498

---

[3] The record reveals that, as of the date of the hearing, it had been "three or four months" since H.R last "reached out to" or had "any kind of contact at all" with his daughter and M.R. agreed that, "sitting here today" she was "the best [she] had ever been." Transcript Volume II at 95, 113.

(quoting *S.D. v. G.D.*, 195 N.E.3d 406, 411 (Ind. Ct. App. 2022) (Altice, J., dissenting), *trans. granted*, *opinion vacated*), the current case is not one we would describe as particularly close. Rather, the record contains no evidence that H.R. ever harmed or threatened to harm M.R. or that he represents a present credible threat to her safety, as the Act requires. Although we recognize her father's controlling and intrusive behavior, the Act does not provide relief when no present credible threat to the petitioner's safety exists. As this Court has observed, "not all emotional distress is equivalent to the sort of terror and fear of violence that justifies an injunction against another person's behavior." *L.R.*, 223 N.E.3d at 682 (reversing issuance of protective order because there was no evidence respondent placed petitioner in fear of physical harm). Because the record is devoid of the necessary evidence, our review leaves us firmly convinced that a mistake has been made, and we conclude that H.R. has met his burden to establish prima facie error.

For the foregoing reasons, we reverse the trial court's order of protection.

Reversed.

Altice, C.J., and Tavitas, J., concur.

ATTORNEYS FOR APPELLANT

Bryan L. Ciyou
Ciyou & Associates, P.C.
Indianapolis, Indiana

Anne M. Lowe
Fugate Gangstad Lowe, LLC
Carmel, Indiana